EASTBROOK COMMUNITY SCHOOLS CORPORATION and Its Board of School Trustees, Appellants (Plaintiffs Below),

v.

INDIANA EDUCATION EMPLOYMENT RELATIONS BOARD, Victor P. Hoehne, Chairman, Eastbrook Classroom Teachers Association and John Pierce, Appellees (Defendants Below).

No. 2–781A219.

Court of Appeals of Indiana, Second District.

April 5, 1983.

Arden W. Zobrosky, Marion, for appellants.

Richard J. Darko, Kevin O. Faley, Bayh, Tabbert & Capehart, Indianapolis, for appellees Eastbrook Classroom Teachers Ass'n and John Pierce.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee Indiana Educ. Employment Relations Bd.

SULLIVAN, Judge.

Eastbrook Community Schools Corporation, *et al.* (Eastbrook) appeals the trial court's decision affirming the Indiana Education Employment Relations Board's (IEERB) conclusion that Eastbrook committed an unfair labor practice.

We reverse.

Eastbrook and the Eastbrook Classroom Teachers Association (ECTA) had entered into a collectively bargained master contract covering the period August 23, 1977 to August 22, 1978 which included the following provision:

> "The school calendar, as approved by the Board of School Trustees, indicating specific days of attendance for students and teachers, shall remain in effect and shall not be changed, unless so directed by the State officials. The recommended calendar will not be submitted to the Board for approval until teachers have had the opportunity to discuss the calendar with the school administrators.
>
> If the schools are closed on any scheduled attendance days for emergency purposes, teachers' salaries or other benefits shall not be reduced in any manner due to school closing." Record at 181.

The record indicates that under the individual contracts entered between the teachers and Eastbrook, the teachers agreed to teach for 180 days within a specified "school

year." However, it had been the practice for the teachers to actually teach only 177 of these days, the remaining three being paid holidays.

Having discussed the school calendar with the ECTA, the School Board on April 10, 1978, adopted a calendar for the 1978–79 term which provided that:

"In the event all schools are closed by the Superintendent, such days in excess of five to a maximum of ten days may be rescheduled during the period of May 25, 1979 to and including June 8, 1979. Employees paid for such emergency days will be required to work without additional compensation, on such rescheduled days.

If there are no emergency school closings, the academic year will end on May 24, 1979.

In no case shall teachers or bus drivers be scheduled to work in excess of one hundred and seventy seven (177) days nor will student days exceed one hundred and seventy five (175)." Record at 236–37. There had been no previous provision for emergency school closings. Such provision was apparently precipitated by the fact that school had been closed due to snow for about 17 days during the 1977–78 school term.

Claiming that the school board had not bargained with the ECTA representative over the school calendar and its emergency closing contingency, the ECTA filed an unfair labor practice complaint with the IEERB on May 17, 1978, alleging that the school board violated I.C. 20–7.5–1–2(n), 3, 4, 6(a), 7(a)(5) and 7(a)(6) (Burns Code Ed. 1976). The ECTA petitioned the Board to order Eastbrook to rescind the calendar, to "cease and desist from further preconditioning of bargaining," and to bargain in good faith those items which are subjects of mandatory bargaining. Record at 71.

The Hearing Examiner concluded that the "number of teacher days, the making up of days lost due to snow and/or emergency closings, and the pay for such days are mandatory bargainable items under Section 4 of the Act." Record at 29. The Examiner further concluded that the school

board committed an unfair labor practice in instituting a calendar, which required teachers to make up days on which they did not work due to an emergency closing of the schools, without having first engaged in collective bargaining. The Examiner further found that such a "unilateral change regarding a mandatory subject of bargaining during the bargaining period constitutes a precondition to bargaining." Record at 29. Both the IEERB and the trial court affirmed the Examiner's findings of fact and conclusions of law.

In restated form, appellant raises two issues for our review:

1) whether the IEERB had subject matter jurisdiction over the ECTA's complaint; and

2) whether the court's decision to affirm the IEERB's action was contrary to law.

I.

We reject the school board's contention that the IEERB lacked subject matter jurisdiction over this claim. Under the Collective Bargaining Act governing school corporations and their "certified employees," a school employer is required to "bargain collectively with the exclusive representative on the following: salary, wages, hours, and salary and wage related fringe benefits." I.C. 20–7.5–1–4 (Burns Code Ed. 1975). Failure to do so constitutes an unfair labor practice. I.C. 20–7.5–1–7(a)(5) (Burns Code Ed.1975).

Section 20–7.5–1–11 states:

"Unfair practices shall be remediable in the following manner:

(a) Any school employer or any school employee who believes he is aggrieved by an unfair practice may file a complaint under oath to such effect, setting out a summary of the facts involved and specifying the section of this chapter [20–7.5–1–1—20–7.5–1–14] alleged to have been violated.

(b) Thereafter, the board shall give notice to the person or organization against whom the complaint is directed and shall determine the matter raised in the com-

plaint, and appeals may be taken in accordance with IC 1971, 4–22–1[4–22–1–1–4–22–1–30]. Testimony may be taken and findings and conclusions may be made by a hearing examiner or agent of the board who may be a member thereof. The board, but not a hearing examiner or agent thereof, may enter such interlocutory orders after summary hearing as it deems necessary in carrying out the intent of this chapter."

■■■ Contrary to appellant's assertion, the IEERB need not determine, as a prerequisite to establishing its jurisdiction over the dispute that the school employer did in fact commit an unfair labor practice. The legislature has vested the IEERB with the authority to resolve labor disputes involving school employers and their certificated employees. Here, the ECTA accused the school board of an unfair labor practice in not bargaining over the implementation of a calendar which required them to make up without additional pay, days on which they did not teach due to an emergency school closing. Such a dispute falls within the ambit of the IEERB's jurisdiction.

## II.

■■ Appellees ECTA correctly note that appeals from the IEERB's decision are governed by the Administrative Adjudication Act (I.C. 4–22–1–1 et seq.). In reviewing an administrative determination, a court may not reweigh the evidence. The review may involve whether the agency possessed jurisdiction over the matter and whether its order was made in accordance with proper legal procedure, was based upon substantial evidence, and did not violate any constitutional, statutory, or legal principle. I.C. 4–22–1–18 (Burns Code Ed.1974); *Clarkson v. Department of Insurance of the State of Indiana* (2d Dist.1981) Ind.App., 425 N.E.2d 203, 209.

Pertinent to our review are the provisions of the Teachers' Collective Bargaining Act. Since the "foremost objective of the rules of statutory construction is to determine and effect the true intent of the legislature" (*Park 100 Development Co. v. Indiana Department of State Revenue* (1981) Ind., 429 N.E.2d 220, 222), our analysis must begin with our legislature's expressed intent:

"Legislative intent.—The Indiana general assembly hereby declares that:

(a) The citizens of Indiana have a fundamental interest in the development of harmonious and cooperative relationships between school corporations and their certificated employees;

(b) Recognition by school employers of the right of school employees to organize, and acceptance of the principle and procedure of collective bargaining between school employers and school employee organizations, can alleviate various forms of strife and unrest;

(c) The state has a basic obligation to protect the public by attempting to prevent any material interference with the normal public school educational process;

(d) The relationship between school corporation employers and certificated school employees is not comparable to the relationship between private employers and the employees among others for the following reasons: (i) a public school corporation is not operated for profit but to insure the citizens of the state rights guaranteed them by the Indiana state constitution; (ii) the obligation to educate children and the methods by which such education is effected will change rapidly with increasing technology, the needs of an advancing civilization and requirements for substantial educational innovation; (iii) the Indiana general assembly has delegated the discretion to carry out this changing and innovative educational function to the local governing bodies of school corporations, composed of citizens elected or appointed under applicable law, a delegation which these bodies may not and should not bargain away; and (iv) public school corporations have different obligations with respect to certificated school employees under constitutional and statutory requirements than private employers have to their employees." I.C. 20–7.5–1–1.

Other relevant provisions are as follows:

"Duty to bargain collectively and discuss—Prohibited contract provisions.—On

and after January 1, 1974, school employers and school employees shall have the obligation and the right to bargain collectively the items set forth in section 4[20–7.5–1–4], the right and obligation to discuss any item set forth in section 5[20–7.-5–1–5] and shall enter into a contract embodying any of the matters on which they have bargained collectively. No contract may include provisions in conflict with (a) any right or benefit established by federal or state law, (b) school employee rights as defined in section 6(a) [subsection (a) of 20–7.5–1–6] of this chapter, or (c) school employer rights as defined in section 6(b) [subsection (b) of 20–7.5–1–6] of this chapter. . . ." I.C. 20–7.5–1–3.

"Subjects of bargaining.—A school employer shall bargain collectively with the exclusive representative on the following: salary, wages, hours, and salary and wage related fringe benefits. A contract may also contain a grievance procedure culminating in final and binding arbitration of unresolved grievances, but such binding arbitration shall have no power to amend, add to, subtract from or supplement provisions of the contract." I.C. 20–7.5–1–4.

"Subjects of discussion.—(a) A school employer shall discuss with the exclusive representative of certificated employees, and may but shall not be required to bargain collectively, negotiate or enter into a written contract concerning or be subject to or enter into impasse procedures on the following matters: working conditions, other than those provided in section 4[20–7.5–1–4]; curriculum development and revision; textbook selection; teaching methods; selection, assignment or promotion of personnel; student discipline; expulsion or supervision of students; pupil-teacher ratio; class size or budget appropriations: Provided, however, That any items included in the 1972–1973 agreements between any employer school corporation and the employee organization shall continue to be bargainable.

(b) Nothing shall prevent a superintendent or his designee from making recommendations to the school employer." I.C. 20–7.5–1–5.

"Rights of school employees and school employers.—(a) School employees shall have the right to form, join or assist employee organizations, to participate in collective bargaining with school employers through representatives of their own choosing and to engage in other activities, individually or in concert for the purpose of establishing, maintaining, or improving salaries, wages, hours, salary and wage related fringe benefits and other matters as defined in sections 4 and 5[20–7.5–1–4, 20–7.5–1–5].

(b) School employers shall have the responsibility and authority to manage and direct in behalf of the public the operations and activities of the school corporation to the full extent authorized by law. Such responsibility and activity shall include but not be limited to the right of the school employer to:

(1) direct the work of its employees;

(2) establish policy;

(3) hire, promote, demote, transfer, assign and retain employees;

(4) suspend or discharge its employees in accordance with applicable law;

(5) maintain the efficiency of school operations;

(6) relieve its employees from duties because of lack of work or other legitimate reason;

(7) take actions necessary to carry out the mission of the public schools as provided by law." I.C. 20–7.5–1–6.

The record discloses that the school board and the teachers had *discussed* the calendar prior to its adoption. Therefore, our review is limited to whether the school board committed an unfair labor practice in failing to *bargain* with the ECTA on the subject of the calendar. According to the hearing examiner:

"The item of make-up days lost due to snow or other emergency closings is a mandatory subject of bargaining as encompassed by the words 'hours' and 'salary' as used in § 4 of the Act. The policy

passed April 10, 1978, unquestionably *may affect the number of hours worked* and the *salary of teachers.* A change in a mandatory subject of bargaining by the School Board in the absence of collective bargaining with the exclusive representative is an unfair practice." Record at 27 (emphasis supplied).

The hearing examiner's conclusion, however, does not comport with the evidence. The emergency closing contingency did not in any way change the total number of hours or days on which the teachers were required to teach. Indeed, the hearing examiner so stated in his report.

The appellees respond that although the total number of teaching days remain unchanged, the new calendar might increase the number of days in which teachers are to be *available.* However, according to the standard teachers' contracts,[1] the teachers agreed to *teach* for 180 days. This provision has been employed throughout the school corporation's existence, and the ECTA has not claimed such to be violative of the Bargaining Act. Thus, although appellees' argument as to availability is not without merit, it does not validate the otherwise unsupported conclusion of the hearing examiner.

The scope of our review is thus narrowed to this precise issue: whether the school board had a duty to bargain with the teachers' representative as to a calendar which might affect the *scheduling* of the days, but not the total number of days or hours, on which teachers are required to teach.

■ The initial step in our analysis is to resolve a threshold question. Does the subject of calendar fall exclusively within the school board's managerial prerogative outlined in I.C. 20–7.5–1–6(b)—a delegated right which the board is prohibited under 20–7.5–1–1(d)(iii) from bargaining away, or is it a proper subject for collective bargaining? In considering the adversary positions of the school board and the teachers, a paramount interest must be heard. The

interests of the board and the teachers are subordinate to the right of children to a thorough and adequate education. *See State College Education Association v. Pennsylvania Labor Relations Board* (1973) 9 Pa.Cmwth. 229, 306 A.2d 404, 411. Indeed, the teachers' association along with the board have declared that "providing quality education for the children of the Eastbrook Community Schools Corporation is their mutual aim." Record at 195.

We are further guided by the following statutes:

"The minimum length for a school term is nine [9] months." I.C. 20–10.1–2–2 (Burns Supp.1982);

"(a) Each contract entered into by a teacher and a school corporation must:

. . . .

(3) Contain:

(A) The beginning date of the school year term as determined annually by the school corporation;

(B) The number of days in the school term as determined annually by the school corporation; . . ." I.C. 20–6.1–4–3 (Burns Supp.1982).

■ Although the *minimum* number of days school is to be in session is not subject to either the school board's discretion or to negotiation, the board is vested with the authority to determine when the school term begins. In construing legislation, this court must employ a reasonable interpretation of statutory language. It cannot be presumed that our lawmakers expect their enactments to be applied in an illogical or absurd manner. *City of Indianapolis v. Ingram* (2d Dist.1978) Ind.App., 377 N.E.2d 877, 884. To conclude that the school board has the exclusive authority to decide both the actual number of days in the school term and the commencement date of this term, but *not* the ending date would be illogical. Therefore, although the legislature may not have clearly stated so, the school board must be held to have the corollary authority to determine when the school session ends. Thus, we adopt the position

---

1. The contents of the contract between each teacher and a school corporation is primarily

dictated by statute. *See* I.C. 20–6.1–4–3 *et seq.* (Burns Supp.1982).

taken by the Supreme Court of New Jersey in *Board of Education of the Woodstown-Pilesgrove Regional School District v. Woodstown-Pilesgrove Regional Education Association* (1980) 81 N.J. 582, 410 A.2d 1131:

> "Establishing the school calendar . . . is a non-negotiable managerial decision. . . . '[T]he commencement and termination of the school year and the scheduling and length of intermediate vacations during the school year, at least *insofar as students and teachers are congruently involved, must be held matters of "educational policies" bearing too substantially upon too many and important non-teacher interests to be settled by collective bargaining or binding arbitration.'*" 410 A.2d at 1136 (emphasis supplied).

Although the school calendar necessarily affects the days and hours during which teachers work, we conclude, as did the New Jersey Court, that the calendar's effect on students and other public interests outweigh the private interests of the teachers. The protection of the students' interests being the predominant goal, we must conclude that the school calendar is a matter of educational policy.

In conjunction with the New Jersey Court's reasoning, we also find persuasive, this reasoning:

> "Should educational policy be determined in teacher-school board negotiations where concessions—a necessary part of good faith bargaining—must be made to but one of the many interest groups the school is supposed to represent? Board policy adopted after careful consideration can be readily changed if it becomes evident that the policy is not in the best interests of the students or the community; a negotiated contract cannot. And more basically, what is in the best interest of the students and the community is not always in the best interest of the teachers." Symposium on Teacher Bargaining, 50 Ind.L.J. 344.

Here, the school board modified prior policy to require both the teachers and the students to make-up for days "lost" due to emergency conditions by reporting to school after the originally-scheduled termination date. This change in policy as earlier noted, was apparently motivated by the fact that school had been closed for 17 days in the preceding school term and no provision for rescheduling such school days had been in force. In order for the school board to "maintain the efficiency of school operations," and to "take actions necessary to carry out the mission of the public schools as provided by law," (*See* I.C. 20–7.5–1–6(b)(5) and (7)), it must retain sufficient flexibility in making educational policy decisions and in modifying these decisions as the need arises. To require the school board to annually bargain with the teachers' representative as to the dates of the commencement and termination of school and whether school days are to be rescheduled should an emergency closing occur during that year, would unduly impede the board in exercising its fundamental duty to insure the children's right to quality education. Furthermore, to compel the board to negotiate a contract which includes provisions in conflict with school employer rights as defined in I.C. 20–7.5–1–6(b) would contravene I.C. 20–7.5–1–3 (Burns Code Ed. 1975).

Our inquiry is not ended by our holding that formulation of the calendar is within the board's managerial prerogative. The calendar at issue does not merely fix the beginning and ending dates of the school year, and enumerate the holidays and vacation days. The calendar also includes what is in effect an alternative ending date applicable only if school is closed during the year for at least 6 days.

Our holding is to the effect that this contingency clause does not have such a direct and substantial impact upon "salary, wages, hours and salary and wage related benefits" as to mandate bargaining.[2] How-

---

**2.** As discussed earlier, this clause does not change the total number of days or hours on which the teachers are required to teach. The teachers' contracts provide compensation for days missed due to an emergency school closing. The clause does not affect this salary

ever, to require teachers in the event of an emergency, to provide their services on certain days other than those contemplated within a normal school year, may be said to impact upon the "working conditions" and therefore be subject to discussion under I.C. 20–7.5–1–5(a). We need not, however, decide this question since the school board and the ECTA did in fact discuss the "make-up" provision.

The trial court's affirmance of the IEERB's finding of an unfair labor practice was not in accordance with law. We therefore reverse that judgment.

BUCHANAN, C.J., and SHIELDS, J., concur.

term. It merely requires the teachers to render services, for which they have already been paid, on days other than those originally scheduled. To award the teachers compensation for having to make-up days for which they have been fully compensated amounts to double payment for the same number of teaching hours. We are cognizant of the rather precise salary schedules with which a school corporation must comply, and to the statutory restrictions on. its expenditures. I.C. 20–6.1–5–1 *et seq.* (Burns Code Supp.1982). *See also* I.C. 20–5–2–2(7), (13) and (19); 6–1.1–19–1 *et seq.* (Burns Code Supp.1982). Moreover, the Collective Bargaining Act prohibits the school employer from entering into any agreement that would place such employer in a position of deficit financing. I.C. 20–7.5–1–3 (Burns Code Ed. 1975). Deficit financing "with respect to any budget year shall mean expenditures in excess of moneys legally available to the employer." I.C. 20–7.5–1–2(q).

Unless the legislature expressly allocates funds for additional compensation, we cannot usurp this role through judicial legislation. *See Frost v. Review Board of the Indiana Employment Security Division* (2d Dist.1982) Ind.App., 432 N.E.2d 459, 461. Nor can we compel the school board to bargain with the ECTA for the purpose of reaching an agreement that might place the employer in a position of deficit financing.